Jeffrey **CULVER**, Defendant Below, Appellant,

v.

**STATE of Delaware**, Plaintiff Below, Appellee.

No. 348, 2007.

Supreme Court of Delaware.

Submitted: June 18, 2008.
Decided: Aug. 5, 2008.

---

**6**

Albert M. Greto, Wilmington, DE, for appellant.

Gregory E. Smith, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, JACOBS, RIDGELY, Justices and NOBLE, Vice Chancellor,* constituting the court en banc.

STEELE, Chief Justice, for the Majority:

■ We address, for the first time, the proper procedures that parole and probation officers must follow after they receive a tip from police officers under their statutory authority to search probationers.[1] In this case, probation officers searched probationer-appellant Jeffery Culver's home after police "tipped off" probation officers that they suspected that he was involved in drug activity. On appeal, Culver contends that the probation officers violated 11 *Del. C.* § 4321, and Parole and Probation Procedure 7.19 promulgated under that statute, when they decided to search his home.[2] Specifically he contends that 7.19 does not permit probation officers to search a probationer's dwelling based solely on a request by police officers. Instead, he argues that 7.19 requires probation officers to assess independently the reliability of any information to determine whether that information, in the ordinary course and scope of the probation officer's supervisory duties, would support a reasonable suspicion to search a probationer's dwelling.

A majority agree that 7.19 requires probation officers to assess any "tip" relayed to them and independently determine if a reasonable suspicion exists that would, in the ordinary course of their duties, prompt a search of a probationer's dwelling. In this case, the probation officers accepted, without conducting any independent analysis, and relied on information police received from an anonymous caller whose "tip" made it clear the caller had no personal information about Culver consistent with illicit drug activity. Had probation officers independently analyzed the information consistent with their own agency's regulations, they would have concluded that no reasonable suspicion existed to search Culver or his dwelling. We therefore hold that probation officers unlawfully searched Culver's dwelling and that the fruits of that unlawful search must be suppressed. To hold otherwise would render 11 *Del. C.* § 4321 and the regulations promulgated under it meaningless.[3] The Superior Court's denial of Culver's motion to suppress is **REVERSED,** his conviction is **VACATED** and the case is **REMANDED** for action consistent with this Opinion.

## FACTS

In October 2006, the Superior Court placed Culver on Level III probation fol-

---

* Sitting by designation pursuant to Del. Const. Art. IV § 12.

1. We address any statutory violation before reaching questions under the United States and Delaware Constitutions. *See Williams v. State,* 818 A.2d 906, 908 (Del.2002). Because we find that probation officers violated their clear statutory mandate, we do not reach any constitutional questions. *Downs v. Jacobs,* 272 A.2d 706, 707 (Del.1970).

2. *See McAllister v. State,* 807 A.2d 1119, 1123 (Del.2002).

3. Super. Ct.Crim. R. 41(a) and (f) ("The procedure governing search and seizure shall be as provided by 11 Del. C., c. 23 or other applicable law."); *Mason v. State,* 534 A.2d 242, 253 (Del.1987).

lowing a September 2006 conviction on two counts of misdemeanor theft and one count of criminal mischief. Culver's probationary conditions forbade him from possessing a weapon.

On October 16, 2006, Lt. Ogden of the Delaware State Police received an anonymous tip from an unknown caller with no past proven reliability. The tipster told Lt. Ogden that he suspected drug activity at Culver's home at 3210 Sapphire Court. The caller also described Culver's physical characteristics and stated that Culver drove a silver Mercedes Benz. According to Lt. Ogden's suppression hearing testimony, the caller specifically said that "it was obvious that [Culver] was involved in drug activity based on the volume of vehicles that would come to his residence, stay there for a few minutes and leave." It is clear from Lt. Ogden's testimony about the tip that the informant did not, in fact, have any personal knowledge or contact with Culver to support any conclusion about Culver being engaged in "drug activity." The caller provided Lt. Ogden with some easily observable information such as a physical description of Culver, an address (which turned out to be Culver's dwelling), and claimed that a silver Mercedes Benz with a Pennsylvania license plate was being used for the drug activity. There is no evidence that the caller had offered any basis from which an objective person could conclude the caller had personal knowledge of Culver's activities.[4] Thus, at best, the caller's "tip" could be viewed as conclusions the caller drew based solely on observations from the street.

Despite the tipster's lack of personal knowledge, Lt. Ogden decided to follow up and went to Culver's address that same day, October 16. Lt. Ogden noticed a silver Mercedes Benz with a Pennsylvania license plate parked directly in front of Culver's house. Before Lt. Ogden left, he noticed that two black males got out of a car—which Lt. Ogden concluded was a rental based upon his training and experience—and entered Culver's home. Approximately ten minutes later, the two men, Culver and a fourth person, left Culver's house and drove away in the silver Mercedes.

Lt. Ogden contacted Corporal Daniels of the Delaware State Police and requested his immediate assistance. Lt. Ogden remained in front of Culver's dwelling and Daniels followed Culver's car. After noticing that the Mercedes had tinted windows, Daniels requested and received authorization from Lt. Ogden to stop and search the Mercedes and the four occupants. The police officers used a K–9 to search the car and its occupants. The police found nothing incriminating.

Undeterred by an evidently flimsy and unreliable tip followed by an utterly fruitless search, Lt. Ogden contacted Patrick Cronin, Culver's probation supervisor, and informed Cronin that the State Police had received an anonymous tip. Cronin testified that Lt. Ogden "advised me that [Lt. Ogden] had received a tip that an individual at 3210 Sapphire was involved in drug activity, that he was doing surveillance there, and observed something that he had found to be suspicious, a car stop and identified [sic] one of the participants in the suspicious activity was on Level III probation, and identified him to me as Jeffrey Culver, the defendant." At this point, (1) Lt. Ogden had only received an uncorroborated anonymous tip, not alleged to be based on personal knowledge, and (2) the police had searched (with the assistance of a K9) Culver's Mercedes, which was reportedly "involved in drug activi-

---

4. *See LeGrande v. State,* 947 A.2d 1103 (Del. 2008).

ty"—but that search yielded absolutely no evidence of drugs. While Cronin evidently knew of a "car stop," the record does not reveal whether Lt. Ogden told him State Police had searched Culver's car and found no incriminating evidence.

Shortly after Lt. Ogden contacted Cronin, Cronin contacted Melissa Roberts, the probation officer responsible for Culver's supervision. At this point, Cronin and Roberts decided to conduct an administrative search of Culver's home under Probation and Parole Procedure 7.19. Cronin testified they decided to conduct the search for three reasons: (1) Culver had failed drug tests during probation; (2) Culver had missed one curfew; and (3) Cronin had received information from a *"reliable source"*[5] that Culver possessed contraband. Cronin also explained the basis for those three reasons to search Culver's home.

First, Cronin testified that Culver's failed drug test occurred in September 2006, shortly after Culver entered probation. According to Roberts, by the time of Culver's third drug test, the levels of marijuana in Culver's system had been coming down, and by his fourth drug test, he tested negative. To Roberts, this showed that Culver had stopped or at least decreased his use of marijuana. Nevertheless, Roberts considered it a factor in the analysis of whether to search Culver's dwelling. Second, Cronin testified that Culver had recently called in for his curfew about 20 minutes late. Third and finally, Cronin testified that Lt. Ogden "is my reliable source" and "he also gave me the characterization of the information that

he had initially received in the form of the tip and his observations following the tip...."[6] However, neither Cronin nor Roberts identified any known fact before Lt. Ogden's call that would have, in the ordinary course of business, triggered an administrative search.

Lt. Ogden testified that either he or another police officer remained in front of Culver's home until the probation officers searched it. Lt. Ogden testified that "I had had some conversations with Probation and was pretty certain that he going to be violated...." Lt. Ogden "decided to stay [at Culver's house] so that in case, you know, any phone calls were made, somebody could come and take something out of the house, that kind of thing, so I just kind of stayed there until [probation officers] got there to secure it."

When the probation officers searched Culver's home, they found a loaded .357 Magnum revolver, hidden in a heating vent, and a detoxification kit commonly used to attempt to circumvent or defeat urine screening for drug use. Probation officers did not find any drugs or evidence of drug dealing.

Probation officers took Culver into custody for violating his probation. While he was in custody at the VOP Center, an arrest warrant issued for possession of a weapon by a person prohibited. Detective David Kline went to the VOP Center to arrest Culver on the weapons charge. In response to being handed the arrest warrant, Culver stated: "I know why you're here. They found my gun. I'm a rap promoter, and I have a lot of money, and the gun is for protection."

5. We assume the "reliable source" to be Lt. Ogden, who directed the unsuccessful search of Culver's Mercedes. Nothing in the record indicates any attempt by Cronin to seek information about the "tipster" that would confirm his or her reliability.

6. Cronin's "reliable source" evidently did not tell him that the State Police pretextual stop and search of Culver's Mercedes produced nothing consistent with the "tip"—or at least the record is silent in that regard.

Before trial, Culver moved to suppress (1) the evidence found at his home as the product of an unlawful warrantless search and (2) his statement to Detective Kline as a violation of his Miranda rights. A Superior Court judge denied the suppression motion.[7] In April 2007, a Superior Court jury convicted Culver on the weapons charge.[8]

## DISCUSSION

■■■■ We first address whether the Superior Court judge erred by denying Culver's motion to suppress the gun seized and his oral statement after probation officers searched his dwelling. The Superior Court judge concluded that the probation officers had reasonable suspicion to search Culver's dwelling and that reasonable suspicion alone made the search lawful. We review a denial of a motion to suppress evidence after an evidentiary hearing for abuse of discretion.[9] To the extent the claim of error implicates questions of law, we review de novo.[10]

■■■■ Culver contends that the search of his house was an improper administrative search under 11 Del. C. § 4321.[11] That section provides:

Probation and parole officers shall exercise the same powers as constables under the laws of this State and may conduct searches of individuals under probation and parole supervision in accordance with Department procedures while in the performance of the lawful duties of their employment and shall execute lawful orders, warrants and

other process as directed to the officer by any court, judge or Board of Parole of this State.

Specifically, Culver argues that the probation officers' search violated Probation and Parole Procedure 7.19, promulgated under the authority granted by 11 Del. C. § 4321. That Procedure requires:

The officer and supervisor will hold a case conference using the Search Checklist as a guideline. During the case conference the supervisor will review the "Yes" or "No" responses of the officer to the following search decision factors:

(1) Sufficient reason to believe the offender possesses contraband.

(2) Sufficient reason to believe the offender is in violation of probation/parole.

(3) Information from a reliable informant, indicating offender possesses contraband or is violating the law.

(4) Information from the informant is corroborated.

Moreover, that Procedure requires that probation officers assess the reliability of their informants. Specifically, it requires:

In evaluating reliability of information, was the information detailed, consistent, was the informant reliable in the past, and consider the reason why the informant is supplying information.

Finally, the Procedure cautions probation officers:

Keep in mind that an administrative search is an authority assigned to Pro-

---

7. One Superior Court judge decided Culver's suppression motion. A different judge presided at trial.

8. Possession of a Deadly Weapon by a Person Prohibited. 11 Del. C. § 1448.

9. McAllister v. State, 807 A.2d 1119, 1122–23 (Del.2002).

10. Id.

11. Culver also contends that the search violated both the U.S. and Delaware Constitutions. However, we do not address those contentions here. See Williams, 818 A.2d at 908; Downs, 272 A.2d at 707.

bation and Parole Officers and only Probation and Parole Officers may search the scene. If the police get involved in the actual searching; the court has viewed this as probation and parole collaborating with the police and have thrown the evidence out of court.

In addition to the Probation and Parole Procedures, Delaware case law provides:

[t]his Court has held that administrative searches of probationer homes require only reasonable grounds, even if the probation officers do not satisfy each technical requirement of the search and seizure regulations of the Department of Correction. The special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches, but a search of a probationer's home must be reasonable.[12]

## A. *Reliability of the Anonymous Tip*

█ Culver contends that the anonymous caller's tip was entirely speculative, lacked any corroboration, and that, in fact, the later search of Culver's car tended to discount the reliability of the anonymous caller's tip. We must decide whether the anonymous tip relayed to probation officers by Lt. Ogden, together with Lt. Ogden's personal observations while in front of Culver's home, provided the probation officers with reasonable suspicion to search Culver's home. We find that it did not.

█ In this circumstance, it was especially important for probation officers, pursuant to Procedure 7.19, to assess independently the reliability of the information

provided to them. Although we have not strictly held probation officers to the official probation procedures,[13] we now hold that Procedure 7.19 makes it plain that probation officers must rationally assess the facts made known to them before reaching the critical conclusion that there is a reasonable basis to search a probationer's dwelling. Procedure 7.19 specifically requires:

In evaluating reliability of information, was [1] the information detailed, [2] consistent, [3] was the informant reliable in the past, and [4] consider the reason why the informant is supplying information.[14]

The tip provided in this case fails all four parts of the test.

First, we find that the information supplied by Lt. Ogden lacked detail. The tip Cronin received was not "first hand." The tipster had conclusorily surmised that Culver was involved with drug related activity because people were coming to and going from Culver's dwelling. Lt. Ogden did not relay, because he could not, that the tipster *personally* saw Culver or his guests with drugs. Nor could Lt. Ogden reasonably infer from the tip that the caller had any firsthand personal knowledge that Culver possessed or dealt drugs. In short, the unknown caller provided Lt. Ogden with nothing more than his speculative analysis of traffic patterns in front of Culver's home and the caller's conclusion that those patterns established that drug activity was afoot. So conclusory and devoid of any detail about criminal activity was the anonymous caller's analysis that it cannot provide any basis for determining that it was reliable.[15]

---

12. *Donald v. State*, 903 A.2d 315, 319 (Del. 2006).

13. *Id.*

14. Probation and Parole Procedure 7.19(VI)(E)(3)(b).

15. *Jones v. State*, 745 A.2d 856, 870 (Del. 1999).

Lt. Ogden's surveillance added no additional information that corroborated a conclusion that there was drug activity. Lt. Ogden's surveillance demonstrated solely that, in his estimation, one of Culver's guests drove a rental car and that guest came to Culver's house to get a ride in Culver's Mercedes. Lt. Ogden suggested that, in his experience, people involved in drug activity typically use a rental car. That, however, without more, cannot create a reasonable suspicion of drug activity. To hold otherwise would allow probation officers to search a probationer's dwelling frequented by visitors anytime someone arrives for a visit in a rental car. Therefore, we find that Lt. Ogden's communicating the tipster's conclusory opinion that Culver was involved in drug activity, did not provide sufficient detail to support a conclusion that there was a reasonable basis to suspect that Culver was involved in drug activity.

Second, Procedure 7.19 also requires that the probation officers consider whether the provided information is consistent. Again, the caller's tip was neither internally consistent with its own inferred conclusion nor with the later independent investigation undertaken in an attempt to corroborate it. Although the caller did provide verified information about Culver's address and a personal description of the car, that information was readily available by simply observing Culver from the street. That information did not verify Culver's involvement in any illicit activity, however. In *LeGrande v. State*, we held that an anonymous caller's tip was not sufficiently corroborated where:

the police only corroborated the accused's identity, the location of his locked apartment, his probationary sta-

tus, and that his neighbor was wanted. Confirmations of these facts, which could be used to identify LeGrande, "[did] not show that the tipster [had] knowledge of concealed criminal activity."[16]

Likewise, in this case we find that the caller's description of Culver, and activity observable from the street, were not enough to provide a basis to find that the tip provided reason to believe that Culver was engaged in illicit drug activity. The tip was based upon readily observable facts that demonstrated no special insight into illegal activity.

Even more importantly, the specific information purporting to form a basis to believe that Culver was involved with drugs was *inconsistent* with the further, follow up investigation. The caller specifically told Lt. Ogden that Culver used the silver Mercedes in connection with illegal drug activity, yet the K–9 search during the traffic stop yielded no drugs, paraphernalia or any incriminating evidence. If anything, the results of this search should have allayed suspicion that Culver was involved in drug activity.

Third, the State concedes that the informant was not past proven reliable. Although probation officers may typically rely on the information furnished them by police officers, Probation Procedure 7.19 Section VI.(E)(2) and (3) requires that the probation officers independently assess the reliability of the police officer's information. We recognize that, under Procedure 7.19 VI.(E)(2), probation officers could rely on representations based on a police officer's personal observations where the police officer has past experience with the probationer. However, probation officers

16. *LeGrande v. State,* 947 A.2d at 1111 (quoting *Florida v. J.L.,* 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000)).

cannot rely on police officers *vouching* for anonymous callers with no proven track record for supplying credible, reliable information. Rather, police officers must provide probation officers sufficient facts so that the probation officers can independently and objectively assess the reasonableness of the inferences to be drawn from the caller's tip. If probation officers do not engage in an independent analysis of the reliability of facts supporting an "informant's" tip, they would contravene Procedure 7.19 Section VI(F)(3). The probation officers would thereby become essentially surrogates for the police, conveniently used when the police had no lawful authority to act on their own.

In this case, Lt. Ogden provided no evidence to probation officers that either he or the informant had any personal knowledge about Culver that would support a reasonable suspicion that Culver was currently involved with drug activity. The only evidence that Lt. Ogden provided to probation officers about Culver was a speculative hunch. The probation officers should have recognized that that information was deficient. Nothing about the tip demonstrated any personal connection between the caller and Culver and, thus, no credible opportunity for the tipster to have personal knowledge of illicit activity.[17] Instead, the probation officers should have concluded that this tip was entirely speculative, and should have recognized that Lt. Ogden had no independent basis to determine that Culver was involved in drug

activity. Lt. Ogden had no regular contact with Culver that would have afforded him knowledge of Culver's personal habits. Nor did Lt. Ogden's personal observations demonstrate that Culver was involved with drugs. Indeed, the fruitless police search of Culver's Mercedes produced facts inconsistent with drug activity and plainly contradicted the caller's original information.[18] Had the probation officers engaged in the independent inquiry required by Procedure 7.19, they would have recognized these flaws in the caller's tip and Lt. Ogden's information.

Fourth and finally, the Procedure instructs probation officers to consider the intent of the caller when he provided the information. Here, we do not know why the anonymous caller provided the information. It could just as reasonably have been a hoax, the offshoot of a personal vendetta, or random harassment. We do not imply that this would be a fatal flaw in different circumstances. However, absent any evidence that the tip was reliable based on the first three factors, the inability to assess the tipster's intent adds nothing to the equation. Lt. Ogden's[19] intent, on the other hand, was obvious. He wished the probation officers to search under circumstances where he and the State Police had no basis to undertake a search on their own. In effect, Lt. Ogden's unanalyzed request, no doubt well intentioned, flatly contradicted Probation and Parole's policies.

---

17. *See Jones,* 745 A.2d at 870.

18. We find it troublesome that Cronin testified that he knew of a "car stop," but did not testify that he knew the State Police had searched Culver's car, alleged by the tipster to be used in the drug trade, but found nothing incriminating. The promulgators of the four part test for determining reliability of an anonymous tip might well have found that fact to be significant.

19. Fundamentally, it is obvious to all but the *most naive of objective observers,* that Cronin and Roberts considered Ogden, and not Ogden's information the source, to be the "reliable informant." Unfortunately, their "reliable" source of information neglected to tell them about the fruitless search of the Mercedes—an important fact in testing the consistency and reliability of the original tip.

After considering the four factors in Procedure 7.19, we conclude that the probation officers should have conducted an independent assessment of the caller's and of Lt. Ogden's information. Instead, probation officer Cronin pronounced that Lt. Ogden was "my reliable source" and never examined the available information independently. We therefore find that the probation officers improperly relied on conclusory, inconsistent, and unreliable information that cannot sustain a reasonable suspicion to search Culver's home.

### B. *Other Grounds for Reasonable Suspicion*

■ Although Lt. Ogden's tip may have provided the impetus for the probation officers to search Culver's home according to the probation officer's testimony, it was not the only reason for the search. Probation officer Cronin testified the probation officers decided to conduct the search of Culver's home for *three* reasons: (1) Culver had failed drug tests during probation; (2) Culver missed one curfew; and, (3) Cronin received information from Lt. Ogden that Culver possessed contraband. Thus, the second question for us to decide is whether the probation officers had reasonable suspicion to conduct, and would in the ordinary course have concluded, that carrying out their duties properly required an administrative search of Culver's dwelling.

The State concedes that Lt. Ogden's tip catalyzed the immediate search of Culver's dwelling on October 16th. It, in effect, brought Culver up on their "radar screen." But, the State also contends that, even if probation officers could not search Culver based on Lt. Ogden's tip,

probation officers still had independent and reasonable grounds to search Culver's home. The missed curfew and the failed drug tests were known to probation officers well before October 16, however, yet in the ordinary course of business had provoked no administrative search. Probation officers saw no need to depart from routine and search Culver's dwelling before they heard from Lt. Ogden. It is readily apparent that the probation officers did not believe that their regulations governing the supervision of probationers, given those two factors alone, would warrant an administrative search of Culver's dwelling. Only after the introduction of Lt. Ogden's unfounded tip did probation officers decide to depart from routine and conduct an administrative search. Because probation officers apparently concluded, in the ordinary course of business, that there was no basis to search Culver's dwelling by reason of a single episode twenty minute delay in calling in from curfew and for improving drug test results, those two additional reasons failed to provide the reasonable suspicion needed to justify an administrative search of Culver's home.[20]

When examining whether the failed drug test and the missed curfew, without more, could support reasonable suspicion that would justify an administrative search, it is important to remember that both incidents had already occurred without probation officers ever considering a search of Culver's person or home before October 16. Nor is there any evidence of record that probation officers in fact intended to search Culver in the foreseeable future, much less on or before October 16. That leads us inescapably to the conclusion

---

**20.** *See Jones,* 745 A.2d at 870 ("Our finding that the 911 complaint alone did not suffice to establish reasonable and articulable suspicion requires us to search the record for any other evidence the police might have possessed to support a finding of reasonable and articulable suspicion sufficient to detain Jones").

that the probation officers did not consider the failed drug test and the missed curfew to be sufficient reasons under their protocols to search Culver's home on October 16.

The question with which we are presented is not whether probation officers may have, hypothetically, at *some* time in the past or in the future concluded that reasonable suspicion existed to search Culver's home based on those two factors alone. Instead, the question is whether probation officers had reasonable suspicion to conduct *this* search on October 16. Without Lt. Ogden's call, we must conclude that the probation officers making this inquiry under the Department of Corrections mandated framework for analysis, would not have concluded there was a reasonable basis to conduct *this* search. Knowing that but for Lt. Ogden's call, the probation officers would not have searched on October 16, we find that Lt. Ogden's call, not an independent objective assessment of the information as required by Procedure 7.19 is what precipitated the search. Because we have concluded that Lt. Ogden's information did not form a basis for reasonable suspicion, we conclude that the probation officers had no basis under their mandated framework for analysis to believe there was reasonable suspicion to search Culver's home on October 16.

The Probation and Parole Procedures, which empower and specify the duties of probation officers, do not specifically address whether the police may call upon probation officers to perform searches for which the police lack probable cause. The Court today divides, not because of consti-

tutional debate, but instead over the conduct the Procedures authorize. The Procedures, or their enabling statute, 11 *Del. C.* § 4321, may, of course, be revised and amended to reflect the desired administrative or legislative policy if the result here does not align with the policymakers' views. At the very least, however, if the duly selected social policy choice is that probation officers are to use their probationary supervisory authority to search a probationer's dwelling where the police lack a reasonable basis to search, then that policy should be clearly, consciously, and openly adopted.

Without reasonable suspicion determined in compliance with their duties under Procedure 7.19, the unlawfully seized evidence and the gun and Culver's oral statement inextricably linked to the seizure of the gun should have been suppressed.[21]

### CONCLUSION

Now, therefore, it is ordered that the judgment of the Superior Court is **REVERSED**, Culver's conviction is **VACATED** and the case is **REMANDED** for proceedings consistent with this opinion. Jurisdiction is not retained.

RIDGELY, Justice, dissenting, with HOLLAND, Justice, joining:

The majority opinion excludes evidence obtained from an administrative search of a probationer triggered by an inconclusive tip from a police officer notwithstanding an alternative reasonable basis for the search upon independent grounds. Probation officers had independent evidence that Culver was using illegal drugs and had violat-

---

**21.** *See Caldwell v. State,* 780 A.2d 1037, 1051 (Del.2001) ("Any evidence recovered or derived from an illegal search and seizure must be excluded from evidence. The exclusionary prohibition extends to the indirect as well as

the direct products of such invasions."). Here, Culver's post-arrest statement was an *indirect product of the illegally seized gun* and must also be excluded.

ed his curfew. Because the totality of the circumstances demonstrated that the probation officers' decision to conduct the search of Culver's residence was reasonable, we would affirm the denial of his motion to suppress the evidence obtained from that search. We would also affirm the denial of Culver's motion to suppress his statements.

## An administrative search requires both substantial compliance and reasonableness

This Court has recognized that "probationers do not have the same liberties as ordinary citizens" and has held that "administrative searches of probationer homes require only reasonable grounds, even if the probation officers do not satisfy each technical requirement of the search and seizure regulations of the Department of Correction."[22] The special nature of pro-

bationary supervision justifies a departure from the usual warrant requirement.[23]

Delaware law puts probationers under the supervision of the Department of Corrections, whose probation officers "shall attempt in each case to effect a satisfactory adjustment between the individual and the individual's needs and the demands of society."[24] By statute, probation officers "may conduct searches of individuals under probation and parole supervision in accordance with Departmental Procedures...."[25] The purpose of the Department of Corrections' procedures governing searches of probationers "is to ensure that the Department has sufficient grounds before undertaking a search."[26] We do not require the probation officers to satisfy "each technical requirement of the search regulations" before conducting an administrative search of a probationer.[27] Rather, we require only substantial compliance[28] because under federal law[29] an administra-

22. *Donald v. State*, 903 A.2d 315, 319 (Del. 2006). *See generally Fuller v. State*, 844 A.2d 290, 291 (Del.2004) ("To the extent that the officers departed from departmental guidelines, the departure did not render the search unconstitutional because of the curtailed rights of a probationer as compared with an ordinary citizen.").

23. *Donald*, 903 A.2d at 319 ("The special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches, but a search of a probationer's home must be reasonable").

24. 11 *Del. C.* § 4321(b)(2). *See also* 11 *Del. C.* § 4301 ("[W]henever it appears desirable in the light of the needs of public safety and their own welfare, [a probationer] shall be dealt with, at restricted liberty in the community, by a uniformly organized system of constructive rehabilitation, under probation or parole supervision instead of in a correctional institution.").

25. 11 *Del. C.* § 4321(d).

26. *Fuller*, 844 A.2d at 292.

27. *Id.*

28. *See Donald*, 903 A.2d at 319; *Bunting v. State*, 907 A.2d 145, 2006 WL 2587074, at *5 (Del.Supr.).

29. *See, e.g., United States v. Knights*, 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable."); *id.* ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."); *Griffin v. Wisconsin*, 483 U.S. 868, 878–80, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

tive search of a probationer's home requires only reasonable grounds.[30]

### There was substantial compliance with Procedure 7.19

Procedure 7.19 of State of Delaware Department of Correction Bureau of Community Corrections Probation and Parole ("Procedure 7.19") provides the guidelines and procedures for probation officers to apply when making an arrest or search of a probationer,[31] and "will be used in the decision-making process for all planned searches" absent exigent circumstances.[32] There are five factors calling for a review of the "yes" or "no" responses before conducting an administrative search: (1) whether the probation officer has sufficient reason to believe the offender possesses contraband; (2) whether the probation officer has sufficient reason to believe the offender is in violation of his probation; (3) whether information from a reliable informant indicates that the offender possesses

contraband or is violating the law;[33] (4) whether information from the informant is corroborated; or (5) whether approval is obtained from the supervisor, manager, or director.[34]

### Procedure 7.19 provides alternative grounds for an administrative search

The majority focuses on the third and fourth factors, which involve the sufficiency of tips (anonymous or otherwise), as dispositive of the "substantially complied" prong of the analysis. We agree with the majority's analysis that the tip was insufficient under *LeGrande*.[35] Regardless, there still must be consideration of the remainder of the checklist guidelines in Procedure 7.19, which the probation officers testified that they went through in making their decision to conduct an administrative search. According to Robert's testimony during the suppression hearing, "Any one of those questions answered yes

---

30. *Majority Op., ibid.*; *Donald,* 903 A.2d at 319; *Fuller,* 844 A.2d at 292; *accord Word v. State,* 782 A.2d 268, 2001 WL 762854, at *3 n. 8 (Del.Supr.) ("We also note the United States Supreme Court's ruling that probation supervision, including administrative searches of a probationer's property, permits a degree of impingement upon privacy that would not be constitutional if applied to the public at large.") (citing *Griffin v. Wisconsin,* 483 U.S. 868, 875, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)).

31. The Superior Court has analyzed and quoted provisions from an older version of these guidelines, which were also labeled Procedure 7.19 in *State v. Harris,* 734 A.2d 629, 633–34 (Del.Super.1998). *See also Everett v. State,* 930 A.2d 928, 2007 WL 1850906, at *1 (Del.Supr.) (quoting from *Harris* a section from Procedure 7.19). In his appendix, defense counsel provided us with the State of Delaware Department of Correction Bureau of Community Corrections Probation and Parole Procedure 7.19 ("Procedure"), which have an effective date of June 5, 2001. Culver was subject to these procedures.

32. Procedure 7.19(VI)(E).

33. In evaluating this third factor, the guidelines provide four additional factors for the probation officer to consider: (1) whether, if the offender was observed by another officer, that officer had past experience with the offender, or a similar type circumstance; (2) whether the information provided by the informant was reliable based on its detail, consistency, and past proven reliability, and after considering the reason why the informant is supplying the information; (3) whether the offender's activity indicates he may possess contraband, which may be supportive of the informant's information; or (4) whether there were prior seizures of contraband from an offender, prior violations of probation, and a conviction pattern. Procedure 7.19(VI)(E)(3).

34. Procedure 7.19(VI)(A)(6)(a). There is no dispute that this fifth factor was met.

35. *See LeGrande v. State,* 947 A.2d 1103 (Del. 2008).

establishes sufficiency under 7.19 to conduct an administrative search."

Procedure 7.19 does not require information from a reliable informant as the *sine qua non* for a valid administrative search. To the extent that the probation office receives an anonymous tip, this Court's opinion in *LeGrande* explains why corroboration of the concealed criminal activity in the tip needs more than just the confirmation of facts tending to identify a determinate person.[36] Those requirements do not change when the tip comes indirectly from the police.[37]

The majority recognizes this point, but further interprets Procedure 7.19 to require police officers to "provide probation officers with sufficient facts so that the probation officers can independently and objectively assess the reasonableness of the inferences to be drawn from the caller's tip."[38] Nothing in Procedure 7.19 requires this sharing of information and it is unnecessary given the well-established standards for evaluating the credibility of tips. Indeed, the United States Supreme Court's reasoning for not creating such a requirement is persuasive: "[P]olice may be unwilling to disclose their confidential sources to probation personnel."[39] Further, "[i]n some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a proba-

tioner does damage to himself or society."[40]

More importantly, the tip provided to the probation office—which was undisputedly and conceded by the State as insufficient to generate either reasonable suspicion or probable cause—was but one reason for the administrative search in this case. After concluding that the tip provided here should have resulted in a negative response to the third and fourth factors of Procedure 7.19's checklist requirement, the majority acknowledges that it still must evaluate the other reasons given by the probation office and whether they provide a reasonable basis for the probation officer to conduct an administrative search. The majority states "[w]ithout Lt. Ogden's call, we must conclude that the probation officers making this inquiry under the Department of Corrections mandated framework for an analysis would not have concluded there was a reasonable basis to conduct *this* search."[41] We disagree.

An administrative search based upon either drug possession or drug consumption by a probationer stands on its own under either the first and second factors of Procedure 7.19 to justify an administrative search. As conceded by the majority, the officers answered "yes" to these factors and explained that two of the three reasons why they conducted the search were that (1) Culver had failed drug tests during probation and (2) that he had missed

36. *Id.* at 1111.

37. In this case, the police called and basically said to the probation officers "your probationer is on our radar even though we just conducted a search that turned up empty." The probation officers then looked at Culver's file to determine the history of his supervision and whether they had a reasonable basis to conduct an administrative search. Cronin testified that the decision to initiate the search was made by himself and Roberts, and he

confirmed that nobody from the State Police had asked them to conduct the search.

38. Majority Op., *supra*, at 12–13.

39. *Griffin v. Wisconsin*, 483 U.S. 868, 879–80, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

40. *Id.* at 879, 107 S.Ct. 3164.

41. Majority Op., *supra*, at 15.

one curfew. The first reason supports answering "yes" to the first and second factors; the second reason supports answering "yes" to the second factor. Procedure 7.19 authorized an administrative search for either reason notwithstanding the police officer's "tip" and the majority's analysis of factors three and four. The officers testified that these were also reasons in addition to the tip that provided a sufficient basis for conducting the search and the Superior Court accepted their testimony. There is no dispute that the search itself was conducted properly. We find no abuse of discretion by Superior Court in concluding that the probation officers substantially complied with the procedural requirements for the administrative search.

### The administrative search was reasonable

Even with substantial compliance with Department of Corrections procedures, there still needs to be a reasonable basis to conduct the administrative search to pass constitutional muster.[42] A search of a probationer must be reasonable to be constitutionally sufficient.[43] "Reasonableness is a flexible concept which must be considered with regard to the totality of the circumstances and with particular regard to the balancing of the needs of effective and reasonable law enforcement with the rights of privacy of the individual."[44] To address how we should review the reasonableness of an administrative search, we need look no further than how reasonableness is measured in *every* other Fourth Amendment context.

In analyzing the issue under the Fourth Amendment, the reasonableness of a seizure,[45] pat down search,[46] a warrantless arrest,[47] an arrest warrant,[48] or search

42. *See Fuller*, 844 A.2d at 292 ("Even if the officers did not follow each technical requirement of the search regulations before searching [the probationer], they did satisfy those that affect the reasonable inquiry required under the United States and Delaware Constitutions.").

43. *See* Majority Op., *ibid.*; *Fuller*, 844 A.2d at 292; *Donald*, 903 A.2d at 319. *See also Griffin*, 483 U.S. at 878–880, 107 S.Ct. 3164.

44. *Williams v. State*, 331 A.2d 380, 382 (Del. 1975). *See also Purnell v. State*, 832 A.2d 714, 719 (Del.2003) ("Reasonable and articulable suspicion is a less stringent standard than the probable cause standard and requires a quantum of proof that is less than preponderance of the evidence.").

45. *E.g., Jones v. State*, 745 A.2d 856, 863 (Del.1999) (recognizing that under *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a Fourth Amendment seizure "does not occur until the officer uses physical force or the defendant submits to the authority of the officer"). *See also id.* at 869 ("In our view, the question presented by Jones of when a seizure has occurred under

Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence.").

46. *E.g., Caldwell v. State*, 770 A.2d 522, 531–32 (Del.2001) (explaining that a *Terry* pat down search must be "founded upon a 'reasonable suspicion'" and while deference is given to an officer's experience and knowledge, "the facts which form the basis of the reasonable suspicion must 'be capable of measurement against an objective standard'").

47. *E.g., Coleman v. State*, 562 A.2d 1171, 1177 (Del.1989) ("The requisite analysis in determining the sufficiency of probable cause for a warrantless arrest is determined according to a 'totality of the circumstances' test.") (quoting *Thompson v. State*, 539 A.2d 1052, 1055 (Del.1988)). *See also O'Neil v. State*, 691 A.2d 50, 54 (Del.1997) ("[P]robable cause is measured by the totality of the circumstances through a case by case review of 'the factual and practical considerations of everyday life on which reasonable and prudent men act.'") (internal brackets omitted) (quoting *State v.*

warrant,[49] the reviewing court does not focus on the subjective motivations or intent of the particular person, but instead makes an objective determination of whether the totality of the circumstances support what is required under the law. Whether it was reasonable for probation officers to conduct an administrative search should be analyzed no differently.

There is no dispute regarding the information within Culver's file when the probation officers examined it. Culver's probation started September 5, 2006. His first drug test, administered on September 7 to establish a baseline for his drug levels, tested positive for cocaine (approximately 457 out of a 1000 point scale) and "over 100" for marijuana.[50] Roberts testified that results "over 100" indicated that Culver was "smoking in large quantities and usually at approximately a daily rate" and "actively smoking, if not on a daily basis, close to it." Culver again registered "over 100" on his second drug test, administered on September 28, a result which Roberts testified indicated to her that the marijua-

na levels in his system "stayed exactly the same."[51] The third drug test was on October 12 and Culver registered at 73. Roberts testified that this result demonstrated Culver was "probably smoking less frequently, but still pretty heavily" and that he was "actively smoking if [the result is] still greater than 50." On October 14, Culver missed his curfew, and on October 16, the probation office, prompted by the phone call by Lt. Ogden, examined Culver's file. The record also indicates that there was a fourth drug test which registered "negative," but a date for this test does not appear in the record. Because the search was on October 16, presumably this test was done during that four-day interval.[52]

The majority agrees that under the ordinary totality of the circumstances approach, the question facing a trial court (and this Court on appeal) is whether an objective probation officer, examining these facts, would have had a reasonable basis to conduct the search that day. Instead of applying this objective analysis,

*Maxwell*, 624 A.2d 926, 928 (Del.1993)); *Bennefield v. State*, 659 A.2d 227, 1995 WL 13425, at *1 (Del.Supr.) ("The existence of probable cause is determined by a review of the totality of the circumstances and the specific facts known to the police officers at the time of the arrest.").

48. *E.g.*, *Thomas v. State*, 467 A.2d 954, 956 (Del.1983) ("For an arrest warrant to be valid, the issuing judicial officer must be presented with sufficient information to support an independent judgment that probable cause for the warrant exists.").

49. *E.g.*, *LeGrande v. State*, 947 A.2d 1103, 1107 (Del.2008) ("An affidavit in support of a search warrant must, within the four-corners of the affidavit, set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place.") (quoting *Sisson v. State*, 903 A.2d 288, 296 (Del.2006)).

50. Roberts testified that the marijuana scale only measured up to 100.

51. Roberts testified that the purpose for the second drug test at the end of the month was to determine "whether he is using less frequently or using more...."

52. Thus, in *four days or less*, Culver's test result did not just decline (as it had slowly done between drug tests two and three); it dropped from 73 to zero, or "negative." Roberts explained that the results "would obviously be at zero, if he had nothing in his system," but also testified that use of a detoxification kit "can clean his system and make his urine screens come up negative for any illegal substance." "Actively smoking" to "negative" in four days objectively supported an inference that Culver *may* have used a detoxification kit to mask personal drug use. While a search is never justified by what is found, we note that a detoxification kit was discovered during the administrative search.

the majority concludes that *these* officers did not have a reasonable basis to do so because *they* "would not have searched on October 16, but for Lt. Ogden's call." "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."[53] Nor do subjective intentions play a role under an ordinary Fourth Amendment analysis of an administrative search of a probationer by probation officers.[54]

In our view, the question is not what these particular officers did or did not choose to do before October 16; the question is whether it would have been reasonable for a probation officer, after examining Culver's file (and ignoring the tip from the police), to have decided to conduct an administrative search. We find it is objectively reasonable for probation officers to conduct an administrative search of the home of a probationer whose drug tests are positive for more than a month and which show him "actively smoking" just

four days before. The subsequent drop from 73 to "negative" in the four-day interval between the third test and the search provides further reasonable support because of the probation officers' experience with drug detoxification kits. Culver also missed his curfew. The totality of these circumstances provided reasonable grounds to conclude that Culver possessed contraband and was in violation of his probation.

Notwithstanding Culver's claim that the test results were consistent with the residual effect of past and not current drug use, the trial judge accepted the probation officer's testimony concerning Culver's continuing drug use while on probation. Neither Culver nor the majority have demonstrated that these findings were clearly erroneous.[55] Accordingly, there was no abuse of discretion in the Superior Court's denial of Culver's motion to suppress the evidence seized during the administrative search.[56]

**53.** *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). *See also State v. Prouse,* 382 A.2d 1359, 1364 (Del.1978) ("[B]urdening a criminal defendant with the task of proving that a police officer acted with an illegal subjective intent would as a practical matter emasculate any limited rule concerning random stopping procedures, and in turn, emasculate Fourth Amendment rights."); *id.* ("We hold, therefore, that a random stop of a motorist *in the absence of specific articulable facts which justify the stop* by indicating a reasonable suspicion that a violation of the law has occurred is constitutionally impermissible and violative of the Fourth and Fourteenth Amendments to the United States Constitution.") (emphasis added).

**54.** *United States v. Knights,* 534 U.S. 112, 122, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose."); *see also id.* at 122–23, 122 S.Ct. 587 (Souter, J., concurring) ("We now hold that law-enforcement

searches of probationers who have been informed of a search condition are permissible upon individualized suspicion of criminal behavior committed during the probationary period, thus removing any issue of the subjective intention of the investigating officers from the case.").

**55.** *See Chavous v. State,* 953 A.2d 282, 2008 WL 2527344, at *3 n. 15 ("To the extent the trial judge's decision is based on factual findings, we review for whether the trial judge abused his discretion in determining whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.").

**56.** Culver's federal constitutional argument—often referred to as the "stalking horse" argument because it asserts that the probation officer is acting as an agent (a "stalking horse") of the police in order to circumvent the warrant requirement under the ruse of an administrative search—has been rejected as a matter of federal law. *See United States v. Knights,* 534 U.S. 112, 122, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (holding that the offi-

### The statements Culver made were admissible

Because we find there was no abuse of discretion in denying the motion to suppress, we must also address Culver's argument that the Superior Court abused its discretion when it denied his motion to suppress the statements he made to Detective Kline upon the presentment of the warrant for his arrest on the weapon charge. We review the Superior Court's denial of a motion to suppress after an evidentiary hearing for abuse of discretion.[57] To the extent that the claims of error implicate questions of law, our review is *de novo*.[58]

Culver argues that the statement should have been suppressed because the officer did not advise Culver of his *Miranda*[59] rights before presenting him with the warrant. The State does not dispute that Culver was in custody, however it argues that the officer did not engage in the functional equivalent of interrogation, so *Miranda* warnings were not needed. We

agree. The trial judge accepted the officer's testimony and found that his intention was not to question Culver, who made the statement voluntarily and not in response to any question, in order to exculpate himself. Culver's unforeseeable statement was admissible against him.[60] Accordingly, the Superior Court did not abuse its discretion in denying Culver's motion to suppress this statement.

We find no merit to Culver's arguments and would affirm the judgment of the Superior Court in all respects. We respectfully dissent.

cial purpose of probation officers is not part of the Fourth Amendment analysis of the validity of an administrative search); *accord United States v. Williams*, 417 F.3d 373, 377 (3d Cir.2005); *South Dakota v. Kottman*, 707 N.W.2d 114, 120 (S.D.2005); *Riley v. Kentucky*, 120 S.W.3d 622, 628 (Ky.2003). Culver's argument under the Delaware Constitution has been waived because he has made only a conclusory claim before the Superior Court and this Court. *See Ortiz v. State*, 869 A.2d 285, 291 n. 4 (Del.2005).

57. *Ares v. State*, 937 A.2d 127, 130 (Del.2007); *Donald v. State*, 903 A.2d 315, 318 (Del.2006); *Norcross v. State*, 816 A.2d 757, 762 (Del. 2003); *Virdin v. State*, 780 A.2d 1024, 1030 (Del.2001).

58. *Ares*, 937 A.2d at 130; *Donald*, 903 A.2d at 318. *See also McDonald v. State*, 947 A.2d 1073, 2008 WL 1915174, at *8 (Del.2008) (Noble, V.C., dissenting) ("Although it is said

that this Court reviews a trial court's denial of a motion to suppress under an abuse of discretion standard, more accurately, the trial court's findings of historical fact are reviewed under the deferential clearly erroneous standard, but its conclusion as to probable cause, or more specifically its application of the law of search and seizure to those historical facts, is considered *de novo*.") (internal quotation marks and citations omitted).

59. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

60. *See Tolson v. State*, 900 A.2d 639, 644 (Del.2006) ("[A]n officer cannot be held responsible for an unforeseeable statement by the suspect. An interrogation only encompasses actions or words by the officer that he or she *should have known* would elicit an incriminating response.") (citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).